**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| **DAWN DEJONGH** | ) | |
| | ) | |
| **And** | ) | |
| | ) | **Civil Action No:** |
| **JANE PURTEE,** | ) | |
| | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | **Judge:** |
| **v.** | ) | |
| | ) | |
| **CITY OF FRANKLIN, TENNESSEE,** | ) | **Magistrate Judge:** |
| | ) | |
| **CRAIG WRIGHT,** | ) | |
| | ) | |
| **CHLOE CLEMENTE,** | ) | |
| | ) | |
| **SCOTT QUINN,** | ) | **JURY DEMAND** |
| | ) | |
| **ROBERT DILWORTH** | ) | |
| | ) | |
| **CHARLES RICHARDS,** | ) | |
| | ) | |
| **RANDALL ATKINSON,** | ) | |
| | ) | |
| **DERRICK BRADY,** | ) | |
| | ) | |
| **JUSTIN HUGHES,** | ) | |
| | ) | |
| *Defendants.* | ) | |

---

## COMPLAINT

---

1. Plaintiffs bring this 42 U.S.C. § 1983 action alleging that Defendants violated Plaintiffs'
   constitutional rights on July 3rd and 4th, 2023, and continue to violate Plaintiffs' rights by
   holding onto Plaintiffs' personal property. Plaintiffs now seek damages and injunctive
   relief against Defendants for these violations of Plaintiffs' constitutional rights.

1

## PARTIES

2. **Plaintiff Dawn Dejongh ("Ms. Dejongh")** is an adult resident of Williamson County, Tennessee.

3. **Plaintiff Jane Purtee ("Mrs. Purtee")** is an adult resident of Davidson County, Tennessee.

4. **Defendant City of Franklin, Tennessee ("Franklin")** is a governmental entity organized under the laws of the State of Tennessee and located in Williamson County, Tennessee.

5. **Defendant Craig Wright ("Detective Wright")** is an adult resident of Tennessee, who on information and belief resides in Williamson County, Tennessee.

6. **Defendant Chloe Clemente ("Officer Clemente")** is an adult resident of Tennessee, who on information and belief resides in Williamson County, Tennessee.

7. **Defendant Scott Quinn ("Sergeant Quinn")** is an adult resident of Tennessee, who on information and belief resides in Williamson County, Tennessee.

8. **Defendant Robert Dilworth ("Sergeant Dilworth")** is an adult resident of Tennessee, who on information and belief resides in Williamson County, Tennessee.

9. **Defendant Charles Richards ("Lieutenant Richards")** is an adult resident of Tennessee, who on information and belief resides in Williamson County, Tennessee.

10. **Defendant Randall Atkinson ("Officer Atkinson")** is an adult resident of Tennessee, who on information and belief resides in Williamson County, Tennessee.

11. **Defendant Derrick Brady ("Officer Brady")** is an adult resident of Tennessee, who on information and belief resides in Williamson County, Tennessee.

12. **Defendant Justin Hughes ("Officer Hughes")** is an adult resident of Tennessee, who on information and belief resides in Williamson County, Tennessee.

## JURISDICTION AND VENUE

13. This Court has federal question jurisdiction over the federal claims in this matter pursuant to 28 U.S.C. § 1331.  Venue lies in this district pursuant to 28 U.S.C. § 1391(b)(2) because Defendants reside in this district and the events at issue in this lawsuit occurred in this district.

## FACTUAL BACKGROUND

### A. Background

14. Plaintiff Ms. Dejongh is a sixty-one-year-old mother of two.  Prior to the incident at issue in this lawsuit, Ms. Dejongh had no criminal history.

15. Plaintiff Mrs. Purtee is Ms. Dejongh's eighty-five-year-old mother, and is grandmother to Ms. Dejongh's children.  Prior to the incident at issue in this lawsuit, Mrs. Purtee had no criminal history.

16. Ms. Purtee resides in a condo that is owned by Ms. Dejongh.

17. Ms. Dejongh is the mother of two children, Garet and Gavin Dejongh.  As a result of the incident discussed in this lawsuit, Garet is now deceased.

### B. Garet's Suicide

18. On July 3, 2023, Ms. Dejongh's adult son, Garet Dejongh, committed suicide at the condo where Mrs. Purtee resides.

19. Garet committed suicide by hanging himself in the bathroom.

20. Although Mrs. Purtee was in her home at the time, she was not in the bathroom and had no idea what Garet had done until it was already too late.

3

21. Eventually, Mrs. Purtee checked on Garet and discovered what he had done.

22. Mrs. Purtee immediately called Ms. Dejongh and told her what Garet had done.

23. Ms. Dejongh then immediately called 911, begged for help, and raced toward the condo.

24. On or about 5:53 P.M., the Franklin Fire Department ("FFD") and Franklin Police Department ("FPD") dispatched first responders to the condo.

25. While awaiting the arrival of first responders, Mrs. Purtee attempted to save her grandson's life with her own rudimentary first aid skills.

### C. The First Responders Arrive

26. Officer Clemente was the first FPD officer to arrive at the condo.

27. When she entered the condo, Officer Clemente went to the bathroom and found Mrs. Purtee attempting to revive Garet.

28. Officer Clemente then took over this effort from Mrs. Purtee.

29. Mrs. Purtee informed Officer Clemente that Garet had been in the bathroom for 15 – 20 minutes before Purtee found him.

30. Officer Clemente could see the towel that Garet had strangled himself with still hanging from the shower rod.

31. On or about 5:57 P.M. FPD Officer Jared Anderson arrived and entered the condo, and found Officer Clemente and Mrs. Purtee in the bathroom attempting to revive Garet. Officer Anderson helped Mrs. Purtee get up and exit the bathroom so that Anderson could join in the effort to save Garet.

32. Anderson and Clemente then carried Garet out of the bathroom and into the living room, where Franklin Fire Department EMT's had arrived.

33. On or about 6:00 P.M., EMT's took over the task of attempting to save Garet's life.

4

34. The EMT's first employed manual chest compressions, and then switched to using a "LUCAS tool," a machine that provides consistent chest compressions at a designated pressure, to try to save Garet's life.

35. While the EMT's attempted to save Garet's life, Officer Anderson returned to the bathroom and inspected it. Anderson saw the towel that Garet had used to hang himself still hanging from the shower rod.

36. After inspecting the bathroom, Anderson went into the adjacent bedroom and inspected it as well. Anderson saw nothing in the bedroom suggesting any other manner of death besides suicide.

37. On or about 6:05 P.M., Ms. Dejongh entered the condo, crying out repeatedly, "Garet, Momma loves you."

38. Officer Clemente blocked Ms. Dejongh from getting past the entryway to the condo, and grabbed Ms. Dejongh by the wrists.

39. Sgt. Quinn backed Clemente up, telling Ms. Dejongh should could not go to her son.

40. Clemente then allowed Ms. Dejongh into her condo but cordoned her off behind a couch, across the room from her son.

41. Ms. Dejongh believed that her son was still alive, and was desperate to comfort him. However, she submitted to the FPD officers' insistence that she keep her distance.

42. Ms. Dejongh watched from behind the couch as the EMT's tried to save her son. In tears, Ms. Dejongh cried out over and over again, "Garet, Momma loves you!" and "Please breathe." Ms. Dejongh begged the EMT's to not quit on her son.

5

43. On or about 6:08 P.M., Ms. Dejongh explained to Sgt. Quinn that they had not told her anything about Garet's condition, and she asked if he was still breathing. Quinn declined to answer her question.

44. On or about 6:12 P.M., FPD Sergeant Quinn called Detective Wright and told him about the situation. Quinn informed Wright that Garet had been found by his grandmother hanging in the bathroom, that EMT's were at the condo attempting to save his life, and that Garet was not showing any signs of life.

45. On or about 6:14 P.M, Ms. Dejongh asked the EMT's, "Can you take him to the hospital while you're doing that? They may have more ideas."

46. On information and belief, at that point the EMT's determined that Garet had already passed away.

47. One of the EMT's told Ms. Dejongh, "We have already completed everything that we can do. He is not responding to anything."

48. Believing that the EMT only meant that they had run out of tools and techniques that they could employ at the condo, as opposed to telling her that Garet was in fact already dead, Ms. Dejongh asked the EMT to take Garet to the hospital to see if anything further could be done there.

49. The EMT agreed to take Garet to the hospital.

50. On information and belief, at this point it was clear to all the FPD officers at the condo that Garet had committed suicide by hanging himself to death, and that neither Mrs. Purtee nor anyone else had had any done anything to assist in his suicide.

51. On or about 6:15 P.M., the EMT's prepared to take Garet to the hospital.

52. The FPD officers at the condo deployed to the hospital as well.

## D. The Hospital

53. An ambulance took Garet to the hospital. Ms. Dejongh wanted to ride with her son, but was not permitted to do so.

54. Ms. Dejongh and Mrs. Purtee drove to the hospital and went inside, desperate to be with Garet. Ms. Dejongh remained hopeful that Garet could still be saved.

55. On or about 6:35 P.M., the ER doctor, Dr. Larry Brit, saw Garet and determined that he had already passed away.

56. However, no one from the hospital would tell Ms. Dejongh or Mrs. Purtee that Garet had already died until some forty minutes later.

57. On or about 6:40 P.M., FPD Sergeant Quinn called Detective Wright and told him that Garet was being taken to the hospital because his mother had demanded it.

58. In the meantime, as Ms. Dejongh waited for someone to tell her about her son's condition, she continued believing that Garet was still alive.

59. In a panic that Garet would wake up without her being there, Ms. Dejongh repeatedly insisted to anyone that would listen that she needed to see her son. However, the hospital staff refused to give any information about Garet's condition to Ms. Dejongh, and refused to let her see him.

60. Several FPD officers and Williamson County Sheriff's Office deputies remained at the hospital throughout this process, maintaining a constant law enforcement presence on Ms. Dejongh.

61. On or about 7:10 P.M., Detective Craig Wright arrived at the hospital.

62. At or about 7:14 P.M., Detective Wright met with Ms. Dejongh in the hospital hallway.

63. After introducing himself briefly to Ms. Dejongh, Wright went with Sergeant Quinn to see Dr. Brit.

64. Along the way to see Dr. Brit, Quinn explained to Wright that Garet had hung himself.

65. Detective Wright told Quinn to dispatch a patrol officer to lock down the condo until Quinn could get there. Quinn did so, asserting FPD control over access to the residence.

66. At or about 7:17 P.M., Wright and Quinn met with Dr. Brit and his nurse.

67. Dr. Brit explained that Garet had died, and that it was a suicide. Wright specifically asked if there was any indication that Garet's death was anything other than a suicide, to which Dr. Brit and his nurse responded that there was not. Dr. Brit's nurse further explained that Garet had markings on his legs indicating a history of "cutting."

68. Wright, Quinn, and Dr. Brit then went to speak to Ms. Dejongh in the hallway.

69. At or about 7:18 P.M., Wright, Quinn, and Dr. Brit met Ms. Dejongh in the hallway.

70. Ms. Dejongh demanded to see her son immediately.

71. Wright stated that the doctor needed to talk to her, and then asserted, "[Garet is] not presentable right now. I can't let you see him until he's presentable."

72. Ms. Dejongh responded that her son is always presentable to her "in any way, shape, or form," and that she needed to see him.

73. Dr. Brit then informed Ms. Dejongh that Garet had died.

74. Wright and Dr. Brit then then changed the alleged reason for not allowing Ms. Dejongh to see Garet to it being a "medical examiner case."

75. Ms. Dejongh then demanded to know when the medical examiner would be there, and stated, "I want to hold my son's hand. Now."

76. Wright interjected, and Mrs. Purtee told Wright to "shut up."

77. Wright responded by threatening Ms. Dejongh with arrest, ordering her to either go outside or "you're gonna be in handcuffs."

78. Ms. Dejong insisted, "I want to see my son."

79. Wright reiterated, "You make the choice. Make the choice. You wanna go, or you wanna go in handcuffs?"

80. Quinn tugged Wright away from the tense situation by the arm, and took him to Garet's hospital room.

81. Wright inspected Garet's body and noted that his injuries were consistent with the information Wright had been given, which was that Garet had strangled himself.

82. The hospital nurse further explained to Wright that Garet had bruising on his chest that had been caused by the LUCAS tool compressions.

### E. Garet's Hospital Room

83. At 7:30 P.M., Ms. Dejongh and Mrs. Purtee were finally told that they would be able to see Garet in his hospital room.

84. Prior to allowing her into the room, Quinn and Wright privately discussed and agreed that law enforcement would be with Dejongh in Garet's room the entire time that she was with him in order to prevent her from "doing anything to his body."

85. At 7:31 P.M., Ms. Dejong and Mrs. Purtee were finally allowed into Garet's room. Ms. Dejongh burst into tears as she first saw Garet's body.

86. Wright, Quinn, Clemente, and several other FPD officers stood watch in the room while Ms. Dejongh and Mrs. Purtee grieved, looming over them and denying them any feeling of privacy as they attempted to process their loss.

9

87. Wright in particular forced his presence over Dejongh and Purtee, standing just two-to-three feet from them while they cried and cradled Garet's lifeless body.

88. Ms. Dejongh told Wright to leave, to which he responded, "I'm not going anywhere."

89. Exasperated, Ms. Dejongh explained, "I want it peaceful in here." She then asked a nurse to see if a sergeant could have Wright removed from the room.

90. Ms. Dejongh returned to Garet, cradled his head against hers, and wept.

91. A few moments later, at or about 7:41 P.M., Detective Wright laughed audibly and openly right in front of Ms. Dejong and Mrs. Purtee.

92. Plaintiffs were shocked at Wright's callous disregard for their feelings and for her son.

93. Ms. Dejongh and Mrs. Purtee continued grieving Garet as the hospital staff awaited the medical examiner's arrival.

94. At or about 8:16 P.M., Detective Wright sat in hospital room with his laptop and began writing up a search warrant application for Plaintiffs' condo.

95. At the same time, Sgt. Quinn informed Plaintiffs that Wright would be staying in the room regardless of how it affected them.

96. Wright's search warrant application sought permission to search and seize property from Plaintiffs' condo.

97. On information and belief, Detective Wright understood that the Fourth Amendment required him to have probable cause of a crime in order to obtain a search warrant.

98. On information and belief, Detective Wright was aware that suicide is not a crime under Tennessee law.

99. In order to make out a claim of probable cause, Detective Wright falsely claimed in his search warrant affidavit that he had probable cause to believe that the condo would

10

contain evidence of "Criminal Homicide" (T.C.A. § 39-13-201) and/or "Assisted Suicide" (T.C.A. § 39-13-216).

100.    However, Detective Wright knew that this claim was false, and that he did not have probable cause to believe that searching Plaintiffs' condo would result in the discovery of evidence relating to either of those supposed offenses, or to any other criminal offense.

101.    At or about 8:50 P.M., the Medical Examiner removed Garet's body from the hospital.

102.    At or about 8:58 P.M., the Investigator for the Medical Examiner's Office noted that the "type of death" being reported for Garet was "Suspected Suicide."

### F.  The FPD Officers Lock Down Plaintiffs' Condo

103.    On or about 9:05 P.M., while Dejongh and Purtee were still at the hospital, Officer Atkinson and several other FPD officers went to Ms. Dejongh's condo to prevent Plaintiffs from entering it while Detective Wright obtained a search warrant.

104.    At that point, having already inspected the scene of the suicide and having consulted with the doctor, no FPD officers had any basis to believe that Garet's death was anything other than a suicide, or to believe that Mrs. Purtee or anyone else had intentionally assisted Garet to commit suicide.

105.    Before leaving the hospital, Wright, Quinn, and Clemente spoke with Ms. Dejongh and Mrs. Purtee and informed them that Wright would be obtaining a search warrant for their condo.  The FPD officers further stated that Dejongh and Purtee would not be allowed to enter their condo until the search warrant had been executed.

11

106. After leaving the hospital, Ms. Dejongh called FPD in hopes that a supervisor would stop the illegal search and seizure of her condo.

107. At or about 9:29 P.M. Ms. Dejongh spoke with Sergeant Dilworth, who told her not only that the search would continue, but that if she was not there to unlock the door for Wright then the FPD officers would force entry into the home – meaning that they would break the door in.

108. Sgt. Dilworth further explained that FPD treats "every death" as an investigation case.

109. On information and belief, FPD policy and practice in this regard is, in fact, to investigate suicide cases as if it were a crime. On information and belief, this includes a general practice of forcing the search of death scenes in suicide cases even after the body has already been removed, and even without probable cause to believe that the death involved a crime.

110. Consequently, Ms. Dejongh and Mrs. Purtee felt that they had no choice but to go to the condo and wait there until the search warrant was executed.

111. Ms. Dejongh and Mrs. Purtee were also particularly anxious because Mrs. Purtee's dog was still locked inside the condo, with no opportunity during the past several hours to eat or to go outside to relieve itself.

112. On or about 10:30 P.M., Dejongh and Purtee arrived outside their condo.

113. The FPD officers formed a perimeter around both the condo and around Ms. Dejongh's car.

114. Ms. Dejongh called 911 several times, attempting to reach the FPD Police Chief or another supervisor in hopes that they would intervene and stop the illegal search. '

115.     Ms. Dejongh spoke to multiple dispatchers as well as Sgt. Dilworth a second time, but was unable to obtain any intervention to stop the search.

116.     At or about 10:32 P.M., Mrs. Purtee got out of Ms. Dejongh's car and attempted to approach her condo door.

117.     At this point, Defendants Clemente, Quinn, Richards, Atkinson, Hughes, and Brady were all on the scene, and all participating in preventing Plaintiffs from being able to enter their condo.

118.     Sgt. Quinn stated to Mrs. Purtee, "Ms. Purtee you can't go inside your residence right now."

119.     Mrs. Purtee explained that she needed to go in because her dog was going to defecate on the floor.

120.     Lieutenant Richards demanded Mrs. Purtee's keys, because she had a small can of pepper spray on them.

121.     Initially forgetting that she even had the pepper spray on her keychain, Mrs. Purtee then remembered it and turned her keys over so they could remove the spray.

122.     However, rather than just removing the pepper spray and returning her keys, Richards kept the keys, even after Mrs. Purtee asked for them back.

123.     Mrs. Purtee then sat on her stoop for the next several minutes.

124.     At 10:48 P.M., Mrs. Purtee got up and attempted to walk around the side of her house, so that she could sit on her porch.

125.     However, Officer Brady told her she could not go to her porch.

126.     Mrs. Purtee then walked toward her front door, and tripped as she approached.

127.     Officer Atkinson grabbed Mrs. Purtee's arms.

13

128.     Mrs. Purtee asked Atkinson if she could get her mail, to which Atkinson responded, "No."

129.     Mrs. Purtee submitted to FPD's authority, and retreated from her home.

### G. Search Warrant Execution

130.     At 11:50 P.M.,Wright obtained the illegal search warrant for the condo based on his false allegation that he had probable cause to believe that Garet's death was the result of "Criminal Homicide" and/or "Assisted Suicide."

131.      On July 4, 2023 at or about 12:09 A.M.,Wright and Clemente used Mrs. Purtee's keys to open her front door and then executed the illegal search warrant.

132.     Wright and Clemente spent the next half hour searching Plaintiffs' condo.  While there they took possession of Garet's cell phone, the towel and belt that he had used to hang himself, a grinder, and a pair of scissors.

### H. Aftermath

133.     On July 4, 2023, the Medical Examiner's Office formally ruled Garet's death a suicide.

134.     Also on July 4, 2023, Detective Wright initiated criminal charges against Ms. Dejongh, alleging that she had spit on his shoe at the hospital and that she had made frivolous 911 calls while awaiting the execution of the search warrant, and charges against Mrs. Purtee, alleging that she had threatened to retaliate against him for executing the search warrant on her home.

135.     In April 2024, Plaintiffs attempted through Counsel to obtain the return of the personal property taken during the execution of the search warrant.

14

136.     Plaintiffs' request was made through the District Attorney's Office, as well as through a motion filed in connection with Ms. Dejongh's criminal charges.  Counsel made clear that Garet's phone in particular holds sentimental value for Plaintiffs.

137.     Regardless, Detective Wright and the FPD refused to return Plaintiffs' property.

138.     On May 13, 2024, the Circuit Court heard Ms. Dejongh's motion for return of property. After both parties made clear that the property at issue had no relevance to the criminal charges against Ms. Dejongh or Mrs. Purtee, the judge held that there was no jurisdiction in the criminal case to rule on the motion, and denied it on that ground.

139.     In making this ruling, the judge did not opine substantively on the constitutionality of the continued seizure.

140.     To date, Detective Wright and the FPD are continuing their ongoing seizure of Garet's phone, the towel, the belt, and the scissors.

## CLAIMS FOR RELIEF

### COUNT I: SEIZURE OF PLAINTIFFS' CONDO IN VIOLATION OF THE FOURTH AMENDMENT TO THE U.S. CONSTITUTION
### (42 U.S.C § 1983)

### (ALL DEFENDANTS)

141.     Plaintiff hereby reincorporates paragraphs 1 – 140 by reference.

142.     On July 3, 2023 and July 4, 2023, Defendants illegally conducted a prolonged illegal seizure of Plaintiffs' condo.

143.     Defendants lacked probable cause to believe that a criminal investigation justified the seizure of the condo.

15

144.     Defendants all understood that Garet's death was the result of suicide, not the result of criminal activity.

145.     Defendants' behavior was undertaken under color of law.

146.     On information and belief, Defendants' illegal seizure was the result of an FPD policy and/or practice in which all deaths are handled as criminal investigations, even if there is no probable cause to believe that the death resulted from a crime.

147.     Defendants conducted the illegal seizure in blatant, reckless, and intentional disregard of Plaintiffs' rights.

148.     Defendants' illegal seizure caused Plaintiffs to suffer a deprivation of liberty and emotional harm.

### COUNT II: SEIZURE OF PLAINTIFFS' PERSONS IN VIOLATION OF THE FOURTH AMENDMENT TO THE U.S. CONSTITUTION (42 U.S.C § 1983)

**(ALL DEFENDANTS)**

149.     Plaintiff hereby reincorporates paragraphs 1 – 140 by reference.

150.     On July 3, 2023 and July 4, 2023, Defendants illegally conducted a prolonged illegal seizure of Plaintiffs' condo.

151.     Defendants lacked probable cause to believe that a criminal investigation justified the seizure of the condo.

152.     Defendants all understood that Garet's death was the result of suicide, not the result of criminal activity.

153.     Defendants' behavior was undertaken under color of law.

16

154.     On information and belief, Defendants' illegal seizure was the result of an FPD policy and/or practice in which all deaths are handled as criminal investigations, even if there is no probable cause to believe that the death resulted from a crime.

155.     Defendants communicated to Plaintiffs that if Plaintiffs did not go to the condo to open the door for the search, Defendants would break the condo door in to execute the search.

156.     Based on this threat, and their concern that Defendants would damage Plaintiffs' property while executing the search, Plaintiffs felt compelled to go wait outside the condo for several hours while the search warrant was obtained and executed.

157.     Defendants conducted the illegal seizure in blatant, reckless, and intentional disregard of Plaintiffs' rights.

158.     Defendants' illegal seizure caused Plaintiffs to suffer a deprivation of liberty and emotional harm.

**COUNT III: SEIZURE OF PLAINTIFF MRS. PURTEE'S KEYS IN VIOLATION OF THE FOURTH AMENDMENT TO THE U.S. CONSTITUTION**
**(42 U.S.C § 1983)**

**(DEFENDANTS RICHARDS, WRIGHT, AND CLEMENTE)**

159.     Plaintiff hereby reincorporates paragraphs 1 – 140 by reference.

160.     On July 3, 2023, Defendant Richards took Mrs. Purtee's keys from her outside her residence.

161.     Richards ostensibly took the keys because Mrs. Purtee had a small can of pepper spray on her keychain.  However, after Mrs. Purtee surrendered the keys and asked for the keys back without the pepper spray, Richards refused to return the keys.

17

162.     Defendants Wright and Clemente subsequently took Mrs. Purtee's keys from Richards and used them to illegally enter Plaintiffs' condo.

163.     Defendants did not have probable cause or reasonable suspicion to believe that seizing Mrs. Purtee's keys was necessary in order to investigate a crime or protect anyone's safety.

164.     Defendants' behavior was undertaken under color of law.

165.     Defendants conducted the illegal seizure in blatant, reckless, and intentional disregard of Plaintiffs' rights.

166.     Defendants' illegal seizure caused Plaintiffs to suffer a deprivation of liberty and emotional harm.

### COUNT IV: SEARCH OF PLAINTIFFS' CONDO IN VIOLATION OF THE FOURTH AMENDMENT TO THE U.S. CONSTITUTION
### (42 U.S.C § 1983)

### (ALL DEFENDANTS)

167.     Plaintiff hereby reincorporates paragraphs 1 – 140 by reference.

168.     On July 3rd and 4th, 2023 Defendants collectively worked together to to enable Detective Wright and Officer Clemente to search Plaintiffs' condo.

169.     Shortly after midnight on July 4, 2023, Defendants Wright and Clemente searched Plaintiffs' condo.

170.     Defendants lacked probable cause to believe that a criminal investigation justified the search of the condo.

171.     Defendants all understood that Garet's death was the result of suicide, not the result of criminal activity.

172.     Defendants' behavior was undertaken under color of law.

18

173.     On information and belief, Defendants' illegal search was the result of an FPD policy and/or practice in which all deaths are handled as criminal investigations, even if there is no probable cause to believe that the death resulted from a crime.

174.     Defendants conducted the illegal search in blatant, reckless, and intentional disregard of Plaintiffs' rights.

175.     Defendants' illegal search caused Plaintiffs to suffer emotional harm and the loss of property.

### COUNT V: SEIZURE OF PLAINTIFFS' PROPERTY IN VIOLATION OF THE FOURTH AMENDMENT TO THE U.S. CONSTITUTION (42 U.S.C § 1983)

### (DEFENDANTS WRIGHT AND FPD)

176.     Plaintiff hereby reincorporates paragraphs 1 – 140 by reference.

177.     On July 4th, 2023 Defendant Wright seized Plaintiffs' cell phone, towel, belt, and scissors while executing an illegal search warrant on Plaintiffs' condo.

178.     Defendants lacked probable cause to believe that a criminal investigation justified the search of the condo.

179.     Defendants all understood that Garet's death was the result of suicide, not the result of criminal activity. This understanding was made even clearer later on July 4, 2023 when the Medical Examiner formally ruled Garet's manner of death a suicide.

180.     Defendants' behavior was undertaken under color of law.

181.     On information and belief, Defendants' illegal seizure was the result of an FPD policy and/or practice in which all deaths are handled as criminal investigations, even if there is no probable cause to believe that the death resulted from a crime.

182. Defendants conducted the illegal search in blatant, reckless, and intentional disregard of Plaintiffs' rights.

183. Defendants continue to violate Plaintiffs' rights by continuing to hold Plaintiffs' property, notwithstanding Plaintiff's efforts and explanation through Counsel that the seizure is unconstitutional.

184. Defendants' illegal seizure has caused and continues to cause Plaintiffs to suffer emotional harm and the loss of property.

### COUNT VI: DUE PROCESS VIOLATION FOR BEHAVIOR THAT SHOCKS THE CONSCIENCE IN VIOLATION OF THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION (42 U.S.C § 1983)

### (DEFENDANT WRIGHT)

185. Plaintiffs hereby reincorporates paragraphs 1 – 140 by reference.

186. On July 4th, 2023 Defendant Wright threatened to arrest Ms. Dejongh merely for demanding to see her recently deceased son.

187. Later that same evening, Defendant Wright forced his unwanted presence on Ms. Dejongh while she grieved her son's dead body.

188. While forcing his presence on Ms. Dejongh as she wrested with grief, Wright laughed and made faces at her.

189. Defendant's behavior shocks the conscience.

190. Defendant's behavior was undertaken under color of law.

191. Defendant's behavior was in blatant, reckless, and intentional disregard of Plaintiffs' rights.

192. Defendant's behavior has caused and continues to cause Plaintiff to suffer emotional harm.

## COUNT VII: CONSPIRACY TO VIOLATE PLAINTIFFS' CONSTITUTIONAL RIGHTS

## (42 U.S.C § 1983)

## (ALL DEFENDANTS)

193.    Plaintiff hereby reincorporates paragraphs 1 – 140 by reference.

194.    On July 3rd and 4th, 2023 Defendants conspired to subject Plaintiffs to a variety of searches and seizures without probable cause of any criminal offense.

195.    Defendants each intended to subject Plaintiffs to these searches and seizures, were aware of the searches and seizures that were going to occur, discussed the impending searches and seizures with each other, and participated in enabling the searches and seizures to occur.

196.    Defendant City of Franklin participated in the conspiracy in connection with its policy and practice of treating all suicide cases as criminal investigations, even without probable cause of a crime.

197.    Defendants' behavior was undertaken under color of law.

198.    Defendants' conspiracy was in blatant, reckless, and intentional disregard of Plaintiffs' rights.

199.    Defendants' conspiracy has caused and continues to cause Plaintiffs to suffer emotional harm and the loss of property.

## REQUEST FOR RELIEF

**WHEREFORE**, these premises considered, Plaintiffs pray:

1. That the Defendants Answer this Complaint within the time provided by law.

2. That this cause be tried by a jury.

3. That judgment for Plaintiffs enter against the Defendants on each count.

4. That Plaintiffs be awarded nominal, compensatory, and punitive damages against Defendants.

5. That Defendants be enjoined to return Plaintiff Dejongh's personal property to her.

6. That Plaintiffs be awarded attorney's fees and reasonable litigation expenses, including expert witness fees, pursuant to 42 U.S.C. § 1988 and F.R. Civ. Pro. 54(d).

7. That the court costs in this matter be taxed to Defendants.

8. That Plaintiffs be awarded all other relief to which it may appear they are entitled in the interests of justice.

Respectfully submitted,

*s/ Kyle Mothershead*
Kyle Mothershead, BPR 22953
Relentless Advocacy, PLLC
7000 Executive Center Drive, Suite 240
Brentwood, TN 37027
T: (615) 891-3901 / F: (615) 229-6387
E: Kyle@relentlesslaw.com

22